UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-828-H

DANIEL E. GESEGNET                                                                                    PLAINTIFF

V.

J.B. HUNT TRANSPORT, INC.                                                                       DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Daniel E. Gesegnet, claims that Defendant, J.B. Hunt Transport, Inc. ("Hunt"), discriminated against him in violation of the Americans with Disabilities Act ("ADA") and the Kentucky Civil Rights Act, and also defamed him.[1]

This case presents an unusual set of circumstances. Plaintiff is claiming that Defendant failed to accommodate him in ways unrelated to job performance during the hiring process. In fact, there is no suggestion that Plaintiff would require or even request an accommodation for his actual work. Consequently, there are no readily available models for analyzing this claim.

Hunt has moved for summary judgment. Thereafter, the Court reviewed the memoranda and discussed the case with counsel during a conference. For the reasons that follow, the Court will sustain the motion.

I.

The parties seem to agree upon the material facts. In early 2007, Plaintiff applied to be an independent contractor tractor trailer driver with Hunt. Initially, Plaintiff spoke with a Hunt employee, Patrick Peoples, about the employment process. During this conversation, Plaintiff

---

[1] Hunt has argued for summary judgment on both claims. Plaintiff did not respond to Hunt's argument regarding the defamation claim. The Court will assume Plaintiff has decided to no longer pursue this claim.

told Peoples that he had a heart attack in 2002 and had received several diagnoses from a physician, including bi-polar and anxiety disorders. He discussed his aversion to being in small spaces with others at some length. Potential Hunt tractor trailer drivers must successfully complete orientation, which includes a driving test, a medical questionnaire, a drug screen, and a physical exam.[2] Plaintiff wanted to ensure that these psychiatric diagnoses would not interfere with his new Hunt employee orientation and testing. According to Plaintiff, Peoples reassured him that only a few new employees would be in attendance and that he should not be concerned.

The record does not contain the testimony or opinion of a medical doctor concerning the precise nature of Plaintiff's disability. Plaintiff does offer two different medical forms. One is dated 2008 and the other form from the Hunt orientation is dated January 2009. Plaintiff believes that he gave Peoples the 2008 copy. Both questionnaires contain a line for "nervous or psychiatric disorders, e.g., severe depression." Below this line is an indented line which requests the names of any medications the applicant is taking to treat "nervous or psychiatric disorders." On both questionnaires, the "no" box is checked for "nervous or psychiatric disorders" and the "yes" box is checked next to the medication line.

On January 26, 2009, Plaintiff arrived for the orientation to find about twenty-five attendees. He successfully completed his driving test and then went to a clinic for his drug screen and physical. Hunt contracted the drug screen and physical examination to Concentra, who runs the clinic. Prior to the driving test, attendees were verbally informed that after signing in, they could not leave the clinic area until they had given their urine sample for the drug screen. The same warning appeared on the clinic door and the clinic sign-in sheet. Leaving the clinic

---

[2]The U.S. Department of Transportation has certain requirements for commercial drivers, which explains many of the elements of Hunt's orientation.

area prior to completion of the drug screen is considered a refusal, and therefore a failure of the drug screen.  After entering the clinic area, Plaintiff may have discussed with a clinic employee his problems with confined spaces and may even have asked if he could wait outside.  He says that he waited for approximately two to three hours in the small, L-shaped waiting room.

Gerri Norseworthy, a Hunt employee, was the Service Center Safety Manager who oversaw the orientation.  She was working on computers near the clinic area when she saw Plaintiff leaving.  She approached him in the doorway to the clinic and re-explained the clinic policy.  Plaintiff told Norseworthy that he had trouble with small spaces full of people and may have stated that he needed to "stand away from the crowd."  Gesegnet Dep. 109:13.  Norseworthy recalled seeing only a few other orientation attendees in the clinic waiting room and requested Plaintiff remain in the clinic area.  For the moment, Plaintiff complied.  But, when another attendee closed the blinds in the waiting room, Plaintiff felt as if the room "just slammed shut."  Gesegnet Dep. 111:14.  He hurriedly left the clinic, went to the cab of his truck, took anxiety medication and made a phone call to Norseworthy.

During the phone call to Norseworthy, Plaintiff explained that he had a diagnosed disorder that caused him to leave the clinic area.  Norseworthy reiterated that Plaintiff was considered to have refused the drug screen, was therefore ineligible to be hired, and could leave the orientation.  Because Plaintiff was upset, Norseworthy conferenced in a Hunt human resources employee, Kathy Piha.  She agreed that Hunt considered Plaintiff to have refused the drug screen.  Moreover, she said that Hunt could not hire Plaintiff because of the refusal, and would publish Plaintiff's drug screen failure in the DAC report, a report available to other major freighting companies.  Plaintiff again explained his medical diagnoses to both Piha and

3

Norseworthy. Following this conversation, he called several other Hunt employees, including Patrick Peoples, who told him that Norseworthy was the final decision maker and nothing could be done. Subsequently, Plaintiff filed a complaint with the EEOC and then with this Court.

II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). While the moving party must demonstrate that no genuine issue of material fact exists, in response, the non-moving party must move beyond the pleadings and present evidence in support of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Claims under the Kentucky Civil Rights Act are analyzed similarly to claims under the ADA. *Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky. 2003). The ADA was amended in 2008 by the Americans with Disabilities Act Amendment Act ("ADAAA"). *Jenkins v. Nat'l Bd. Med. Examiners*, No. 08-5371, 2009 WL 331638, at *1 (6th Cir. Feb 11, 2009). Because the events in question took place after the effective date of the ADAAA, the Court will apply the amended act to this case.

III.

Plaintiff claims that Hunt discriminated against him in refusing to reasonably accommodate his known disabilities.[3] When there is no direct evidence of discrimination, as here, courts turn to the familiar burden shifting framework of McDonnell Douglas. *Walsh v. United Parcel Service*, 201 F.3d 718, 715 (6th Cir. 2000). First, Plaintiff must prove a prima facie case. The burden then shifts to the defendant to prove, for this claim, that "the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *DiCarlo v. Potter,* 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir. 1997)).[4] The elements of a prima facie case are: (1) Plaintiff is disabled, (2) Plaintiff is otherwise qualified for the position with Hunt, with or without reasonable accommodation; (3) Hunt knew or had reason to know about Plaintiff's disability; (4) Plaintiff requested an accommodation; and (5) Hunt failed to provide the accommodation. *Myers v. Cuyahoga Cnty.*, *Ohio*, 182 Fed. App'x 510, 515 (6th Cir. 2006) (citing *DiCarlo,* 358 F.3d at 419).[5]

Hunt makes a strong argument that Plaintiff does not have a disability as defined by the ADAAA and Hunt had no knowledge of Plaintiff's alleged disability when he violated the clinic policy. The Court will consider each issue in this section.

---

[3] Plaintiff does not allege a firing or refusal to hire due to a disability.

[4] While *DiCarlo* is a case based upon the Rehabilitation Act, the analysis for claims under the ADA are approached similarly. *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1177 (6th Cir. 1996).

[5] While the elements of a prima facie case of disability discrimination are frequently cited, the elements of a prima facie case of discrimination based on failure to accommodate are less frequently utilized. The Sixth Circuit in *Myers* looked to the elements of a failure to accommodate claim under the Rehabilitation Act as outlined in *DiCarlo*. The main difference between the elements of a prima facie case under the ADA as opposed to the Rehabilitation Act is element four. Regardless, numerous Sixth Circuit cases have stated that the plaintiff must have requested an accommodation. *See, e.g., Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997)(quoting *Monette*, 90 F.3d at 1183).

A.

A disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . ." 42 U.S.C. §12102(1). Plaintiff argues that he meets the definition under either (A) or (B). Hunt accepts that some or all of Plaintiff's psychiatric diagnoses qualify as mental impairments, but argues that his conditions do not substantially limit any major life activity.

Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The ADAAA intended to broaden the scope of those protections and, in fact, states that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter" and that "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." 42 U.S.C. §12102 (4) (A) and (B). Specifically, through the amendments, Congress intended to no longer require "that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'" Pub. L. No. 110-325 §2(b)(4) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184 (2002)).

In difficult cases, a plaintiff usually proves disability through a combination of medical evidence and personal testimony detailing the practical impact of that medical condition. Here, Plaintiff is lacking in each area. The Court finds no medical evidence which precisely defines

6

that extent of Plaintiff's disease and the medical limitations due to it. Without a valid medical opinion, courts cannot simply assume that a disease or diagnosis has disabling consequences. The medical forms fall short of what is necessary.

Plaintiff's deposition testimony does not specifically discuss the effects of his psychiatric diagnoses on "major life activities." Hunt points to this absence of discussion along with Plaintiff's employment history as evidence that Plaintiff's "mental impairments" do not "substantially limit" any "major life activity." However, Plaintiff attached an affidavit to his Response to Motion for Summary Judgment in which he states: "my psychological impairments substantially impair several major life activities. These include thinking, concentrating, learning, interacting with others, sleeping, and working." Plaintiff further elaborates that he chose to drive trucks for a living because he "would not have to frequently interact with people," that he "did not complete high school partly because I was unable to sit in a full classroom and learn," that he avoids certain social settings and encounters, and that he is dependent on certain medications for emotional stability and sleep.

This affidavit is mostly devoid of specific examples of major life impairments and mostly contains conclusory generalizations about his inability to perform basic functions. The Court doubts that the medical and personal evidence here is sufficient to show an actual inability to perform a basic function of life. Nevertheless, given the broad definition of disability Congress intended, the Court will assume that Plaintiff has a disability under the ADAAA.[6]

B.

Hunt argues that it had no knowledge of Plaintiff's alleged disability at the time he

---

[6] The Court will, therefore, not address Plaintiff's argument that Plaintiff is disabled because he has a "record of impairment." 42 U.S.C. §12102(1)(B).

violated clinic policy and that Plaintiff was too late informing it of his disability to be due a reasonable accommodation. The Court will consider the sufficiency of the information Plaintiff provided to Hunt.

Plaintiff had a discussion with Patrick Peoples prior to orientation. During that conversation, Peoples "was [made] aware of the whole entire thing with the psychiatrist and everything else" because Plaintiff "didn't want any complications when driving five hundred miles to Louisville. . ." Gesegnet Depo 129: 4-6 and 9-11. Later at the clinic door, Plaintiff claims to have informed Norseworthy about his problems with small rooms and lots of people. Last, he shared this information about his psychiatric diagnoses in the same conversation in which Norseworthy concluded that Hunt would not hire Plaintiff.

The question is whether the employer "knew or had reason to know of Plaintiff's disability." *Myers*, 182 Fed. App'x at 515. Case law is unclear whether Defendant must know the actual diagnoses. *Hammon v DHL Airways, Inc.*, 980 F.Supp. 919, 926 (S.D. Ohio 1997) (stating that "[t]he employer need only know the 'underlying facts' of the condition," not the diagnosis); *but see Van Compernolle v. City of Zeeland*, No. 1:05-CV-133, 2006 WL1460035 at *12 (W.D. Mich. May 24, 2006) (finding that knowledge of symptoms but not diagnosis or condition is insufficient "knowledge" for employer liability) (citing *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928 (7th Cir. 1995)). However, it is clear that Plaintiff must inform Defendant of limitations that result from the disability. 42 U.S.C. §12112(b)(5)(A) and *Matuska v. Hinckley Twp.*, 56 F.Supp.2d 906, 917 (N.D. Ohio 1999) ("the ADA only requires employers to accommodate the known physical or mental limitations of the employee."). Plaintiff makes vague contentions of fully informing Peoples of his disabilities, but the Court has been presented

8

with no specific information Plaintiff provided to Peoples.

It is also far from clear that the decision-maker, Norseworthy, knew about the disability before Plaintiff violated the clinic policy. See *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999) (finding summary judgment appropriate for employer in part where plaintiff "never told KCATA supervisors that the medications she was taking in mid-1995 left her uncontrollably drowsy on the job until after she committed the offense of twice sleeping on the job, a work rule violation she knew would mandate her discharge"). Though the Court may infer knowledge from Peoples to Norseworthy, *see Thomas v. Mech. Consultants, Inc.,* 655 F.Supp.2d 756, 762-63 (W.D.Ky. 2009), there are no facts upon which such an inference might be based. Moreover, Norseworthy learned most of the information about Plaintiff's diagnoses and limitations when telling him that he could not be hired. Reason dictates that a plaintiff must "have informed his employer of his disability and requested an accommodation prior to the time at which an employer takes adverse action against a disabled employee." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6th Cir. 2010) (Cole, J., concurring). The unusual circumstances and lack of case law directly on point make it difficult to determine if Hunt had sufficient reason to know of Plaintiff's disability.

IV.

Regardless of the preceding analysis, Plaintiff must have proposed a reasonable accommodation to Hunt with sufficient specificity. *Lockard v. Gen. Motors Corp*., 52 Fed. App'x 782, 788 (6th Cir. 2002) (stating that "[t]he burden remains on the employee to request an accommodation"); *Walsh v. United Parcel Service*, 201 F.3d 718 (upholding award of summary judgment to Defendant because the plaintiff did not request a reasonable accommodation). "The

9

employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998).

Plaintiff did discuss his concerns and issues with Peoples. He told Norseworthy that he was having difficulty in a small space with lots of other people and needed to "stand away from the crowd," and may have asked a clinic employee if he could wait somewhere besides the waiting room.[7] While the Court has assumed that Plaintiff informed Peoples of his diagnoses and apprehensions, at best, Plaintiff only claims he may have made vague suggestions or requests for accommodation. Plaintiff's subsequent ability to remain in the waiting room for several hours confirms the non-clarity of any need for accommodation. Even after Plaintiff left the clinic, he made no such request. *See id.* at 1047 (suggesting Plaintiff could have requested accommodation after termination decision was made).

The Sixth Circuit has concluded that a request to transfer to a position "in a well-ventilated and allergen-free workstation that would not 'trigger asthma or cause a drop in peak flow'" was too vague an accommodation request to support a failure to accommodate claim. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998). Plaintiff may have requested he "stand away from the crowd," a request, if actually made, with less specificity than the request at issue in *Cassidy*. The First Circuit not only requires that a request be "direct and specific," but also include an explanation of the link between the disability and the request. *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 102 (1st Cir. 2007) (quoting *Reed v.*

---

[7] Plaintiff does not remember if he did make such a request. Even if he did, the request was possibly to a clinic employee, an employee of Concentra. Plaintiff does not rely on this possible request in his argument to deny Hunt's motion for summary judgment. For these reasons, along with the vague nature of the request, the Court will not consider this a request for accommodation.

10

*LePage Bakeries, Inc.,* 244 F.3d 254, 261 (1st Cir. 2001)).

The Court concludes that no request by Plaintiff, if any were made, was specific and direct nor is there sufficient information upon which Defendant could infer the link between vague comments or requests and Plaintiff's psychiatric diagnoses. For this reason, Plaintiff's claim must fail.

V.

This case presents many difficulties in its analysis. Regardless of these difficulties, it seems an impossible case to make.

Prior to beginning the orientation process, Plaintiff did not affirmatively assert his inability to await his drug test in a small room. There could be many reasons for this, perhaps because Plaintiff did not know the size of the room. In any event, Plaintiff actually remained in the room for several hours.

By the time Plaintiff made his call to Norseworthy asking more directly for an accommodation, the circumstances were changed. By this time Plaintiff had already violated a firm rule prohibiting applicants from leaving the drug test room. At that point, Hunt disqualified Plaintiff for objectively truthful reasons: the violation of a valid orientation rule designed to preserve the validity of drug test results.

Finally, it is not clear that Plaintiff is prevented from reapplying to Hunt or that Hunt would prohibit his future application. What is certain is that Plaintiff did not reapply for the Hunt job. Instead, Plaintiff applied for and obtained an entirely different job.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record